United States District Court
Middle District of Florida
Tampa Division

**DANIEL CASTRENZE,**

>  *Plaintiff,*

v.                                                          **NO. 8:23-cv-1246-VMC-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

>  *Defendant.*

_____

# Report and Recommendation

## I.     Overview

Proceeding under "sentence four" of 42 U.S.C. § 405(g) and under 42 U.S.C. § 1383(c)(3), Daniel Castrenze challenges a final decision by the Commissioner of Social Security denying his application for supplemental security income. Doc. 1. An Administrative Law Judge (ALJ) entered the decision on January 27, 2023. Tr. 20–33. The Commissioner filed a 981-page certified transcript, Doc. 15, 15-1–15-9, which, under Rule 4(b), Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g), serves as the Commissioner's answer. Castrenze thereafter filed a brief, Doc. 23; and the Commissioner filed a response brief, Doc. 24. Castrenze argues the Appeals Council erred in denying his request for review based on findings that jail records submitted after the ALJ's decision are immaterial to the period under consideration and that no reasonable probability the records would change the outcome exists. *See* Doc. 23.

Following briefing, Castrenze moved for remand under "sentence six" of § 405(g). Docs. 25, 25-1. The Commissioner opposes that relief. Doc. 27. Castrenze argues that remand is warranted for consideration of a report of a court-ordered competency and psychiatric evaluation completed after the ALJ's decision, after the Appeals Council denied review, and after Castrenze filed this lawsuit. Doc. 25 at 1–3.

## II. Law

To obtain benefits, a claimant must demonstrate he is disabled. 20 C.F.R. § 416.912(a)(1). A claimant is disabled if he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

The Social Security Administration (SSA) uses a five-step sequential process to decide if a claimant is disabled. 20 C.F.R. § 416.920(a)(1). At step one, the SSA asks whether the claimant is engaged in "substantial gainful activity."[1] *Id.* § 416.920(a)(4)(i). At step two, the SSA asks whether the claimant has a severe impairment or a combination of impairments. *Id.* § 416.920(a)(4)(ii). At step three, the SSA asks whether the claimant has an impairment or combination of impairments meeting or medically equaling the

---

[1]"Substantial gainful activity is work activity that is both substantial and gainful[.]" 20 C.F.R. § 416.972. "Substantial work activity is work activity that involves doing significant physical or mental activities." *Id.* § 416.972(a). "Gainful work activity" is work done "for pay or profit." *Id.* § 416.972(b).

severity of any impairment in the Listing of Impairments.[2] *Id.* § 416.920(a)(4)(iii). At step four, the SSA asks whether the claimant can perform any of his "past relevant work"[3] considering his "residual functional capacity" (RFC).[4] *Id.* § 416.920(a)(4)(iv). At step five, the SSA asks whether the claimant can adjust to other work considering his RFC, age, education, and work experience. *Id.* § 416.920(a)(4)(v). If the SSA finds disability or no disability at a step, the SSA will "not go on to the next step." *Id.* § 416.920(a)(4).

To receive benefits or judicial review of a denial of benefits, a claimant ordinarily must follow an administrative review process. *Id.* § 416.1400. A state agency acting under the Commissioner's authority usually makes an initial determination. *Id.* §§ 416.903(a), 416.1400(a)(1) & (b). If dissatisfied with the initial determination, the claimant may ask for reconsideration. *Id.* § 416.1407. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an ALJ. *Id.* §§ 416.1429, 416.1430. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. *Id.* § 416.1400(a)(4). If the Appeals Council denies review, the

---

[2]In the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1, "for each of the major body systems," the SSA describes "impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). If a claimant has an impairment in the Listing of Impairments (or equaling an impairment in the Listing of Impairments), "he is conclusively presumed to be disabled and entitled to benefits." *Bowen v. City of New York*, 476 U.S. 467, 471 (1986).

[3]"Past relevant work is work that [a claimant has] done within the past five years that was substantial gainful activity and that lasted long enough for [a claimant] to learn to do it." 20 C.F.R. § 416.960(b)(1)(i).

[4]A claimant's RFC "is the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).

claimant may sue in federal district court for review of the ALJ's decision. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 416.1481.

The SSA conducts "the administrative review process in an informal, non-adversarial manner" and "will consider at each step of the review process any information [the claimant] present[s]," 20 C.F.R. § 416.1400(b), including at the Appeals Council step, *id.* § 416.1476(b).

Generally, a claimant must submit evidence to or inform the SSA about evidence no later than five business days before the hearing before the ALJ. *Id.* § 416.1435(a). When the Appeals Council acts on a request for review, the Appeals Council usually considers only the evidence that was before the ALJ. *Id.* § 416.1470(b). But the Appeals Council must review a case at a claimant's request if the Appeals Council "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." *Id.* § 416.1470(a)(5) (2020).[5] The claimant must also demonstrate good cause for not submitting the evidence earlier. *Id.*

---

[5]The previous regulation did not use the word "probability." *See* 20 C.F.R. § 416.1470(b) (2016) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision. It will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record."). Interpreting the previous regulation, the Eleventh Circuit held evidence is "material" if there is a reasonable "possibility" the evidence would change the outcome. *See, e.g., Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1309 (11th Cir. 2018); *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 821 (11th Cir. 2015); *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321 (11th Cir. 2015). The "possibility" standard and cases applying the standard no longer apply.

§ 416.1470(b). The Eleventh Circuit has not defined "reasonable probability" in this context. The Supreme Court has defined a "reasonable probability" in the ineffective-assistance-of-counsel context as "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

When denying a request for review, the Appeals Council need not explain its rationale. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 783 (11th Cir. 2014); *accord Medders v. Soc. Sec. Admin., Comm'r*, No. 21-11702, 2022 WL 222719, at *2 (11th Cir. Jan. 26, 2022) ("[N]o further explanation is necessary where the claimant presents 'additional evidence' related to a medical condition that was already considered by the ALJ."), *cert. denied*, 143 S. Ct. 563 (2023). The Eleventh Circuit has found sufficient an Appeals Council explanation that the additional evidence failed to establish a "reasonable probability that it would change the outcome of the decision." *Weddington v. Soc. Sec. Admin., Comm'r*, No. 21-14096, 2022 WL 2915694, at *2 (11th Cir. July 25, 2022) (internal quotation marks omitted).

Section 405(g), made applicable to claims for supplemental security income through § 1383(c)(3), establishes a district court's jurisdiction to review a final decision by the Commissioner. Section 405(g) provides:

**(g) Judicial review**

[**Sentence one**] Any individual, after any final decision of the Commissioner … made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner … may allow.

5

[**Sentence two**] Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides ....

[**Sentence three**] As part of the Commissioner's answer the Commissioner ... shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.

[**Sentence four**] The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ..., with or without remanding the cause for a rehearing.

[**Sentence five**] The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner ... the court shall review only the question of conformity with such regulations and the validity of such regulations.

[**Sentence six**] The court may, on motion of the Commissioner ... made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner ... for further action by the Commissioner ..., and it may at any time order additional evidence to be taken before the Commissioner ..., but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner ... shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

[**Sentence seven**] Such additional or modified findings of fact and decision shall be reviewable only to the extent provided for review of the original findings of fact and decision.

[**Sentence eight**] The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions.

[**Sentence nine**] Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner … or any vacancy in such office.

42 U.S.C. § 405(g) (re-formatted into separate paragraphs).

Under the plain language of § 405(g), a "sentence six" remand is permitted only if the Commissioner moves for remand for good cause before answering the complaint (a circumstance not present in this action) or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g); *accord Melkonyan v. Sullivan*, 501 U.S. 89, 95 (1991); *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988). For remand under the latter circumstance, the new evidence must relate to the period on or before the ALJ's decision. *Enix v. Comm'r of Soc. Sec.*, 461 F. App'x 861, 863–64 (11th Cir. 2012) (citing *Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999)).

## III.   Administrative Record

### A.   *Castrenze's Background and Application and the SSA's Initial and Reconsideration Determinations*

Castrenze was born in 1987, has a high-school education, and has worked as a fast-food cook. Tr. 31, 267. He applied for benefits on September 29, 2020, alleging he had become disabled more than two decades earlier, on December 1, 1998. Tr. 267. He alleged disability from "right arm and right leg," "ADHD," and "manic depression." Tr. 294. The application was denied at the initial level, Tr. 157–67, and the reconsideration level, Tr. 170–78.

B. *ALJ's Hearing and Decision*

Castrenze requested a hearing before an ALJ. Tr. 207. The ALJ conducted a hearing, at which Castrenze—represented by counsel—and a vocational expert testified. Tr. 98–134.

Following the hearing, the ALJ issued the decision. Using the five-step sequential process, the ALJ found Castrenze was not disabled for the period under consideration: September 29, 2020 (the application date) through January 27, 2023 (the decision date). Tr. 33.

At step one, the ALJ found Castrenze had worked in 2021 but had not engaged in substantial gainful activity since September 29, 2020. Tr. 26.

At step two, the ALJ found Castrenze has severe impairments of "[o]steoarthritis of the right elbow and right knee, bipolar depression, post-traumatic stress disorder, learning disabilities, and substance abuse disorder[.]" Tr. 26.

At step three, the ALJ found Castrenze has no impairment or combination of impairments meeting or medically equaling the severity of any listed impairments.[6] Tr. 26. The ALJ specifically analyzed Castrenze's mental

---

[6]The Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a).

impairments using the four "paragraph B" criteria:[7]

> In understanding, remembering, or applying information, [Castrenze] has moderate limitations. [He] alleged that he has difficulty with memory, following instructions, and completing tasks. However, [he] also stated that he performs household chores, prepares meals, manages funds, takes medications, takes public transportation, and shops in stores, which certainly indicates an ability to understand, remember, or apply information. (Exhibit B5E) …
>
> In interacting with others, [Castrenze] has moderate limitations. Here, [he] alleged that he has difficulty engaging in social activities and getting along with others. However, according to his statements, he admittedly shops in stores, takes public transportation, and deals appropriately with authority. At this time, he also reported that he was living with friends. (Exhibit B5E) …
>
> The next functional area addresses [Castrenze]'s ability to concentrate, persist, or maintain pace. For this criterion, [he] has mild limitations. [He] contended that he has limitations in concentrating generally, focusing generally, following instructions, and completing tasks. On the other hand, [he] said that he prepares meals and manages funds. (Exhibit B5E) …
>
> Finally, [Castrenze] has moderate limitations in his ability to adapt or manage himself. [He] asserted that he has difficulty handling stress. That said, from a psychological perspective, [he] reportedly has no difficulty caring for his personal needs, independently, as to bathing, dressing, grooming, feeding self, and toileting. As discussed above, he has admitted to a wide range of independent activities of daily living. He admittedly he can handle changes in routine "ok". (Exhibit B5E) …

Tr. 26–27. The ALJ explained he was "moderately persuaded" by an assessment of a state agency psychological consultant, Thomas Conger, Ph.D., explaining:

---

[7]An ALJ must evaluate the "paragraph B" criteria and classify the extent of any limitation as none, mild, moderate, marked, or extreme. 20 C.F.R. § 416.920a(c)(3), (4).

> After review of the record in April of 2022, Dr. Conger opined [Castrenze] has a moderate limitation in the areas of interacting with others and adapting or managing himself with no more than a mild limitation in the other two areas of functioning. (Exhibit B7A) While the undersigned generally agrees that [he] has no more than a moderate limitation in the "paragraph B" criteria, the record indicates that [he] has a history of learning disabilities that would impact his ability to understand and apply information. Nonetheless, because [his] mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

Tr. 27.

The ALJ found Castrenze's RFC allows him to "lift and/or carry 20 pounds occasionally and 10 pounds frequently"; "stand and/or walk 6 hours in a workday, and sit 6 hours in a workday"; "occasionally climb ladders, ropes, or scaffolds and crawl"; "frequently climb ramps and stairs, balance, stoop, kneel, and crouch"; and "perform simple and routine tasks with no more than routine workplace changes and occasional interaction with coworker, supervisors, and the public." Tr. 28. The ALJ added as part of Castrenze's RFC that he "must avoid concentrated exposure to extreme heat, extreme cold, and hazards such as moving mechanical parts and unprotected heights." Tr. 28.

The ALJ summarized statements Castrenze had made in his initial disability report:

> [Castrenze] stated he is limited in his ability to work due to right arm and right leg impairment, attention deficit hyperactivity disorder, and manic depression. (Exhibit B3E) [He] reported that he sustained elbow and knee injuries in a motor vehicle accident. (Exhibit B6F) In supporting documentation, he alleged difficulty with lifting, standing, walking, stair climbing, bending, kneeling, reaching, memory, completing tasks, concentration, and getting along with others. (Exhibits B5E, B1E)

Tr. 28.

The ALJ summarized Castrenze's testimony:

[Castrenze] testified that his symptoms related to bipolar disorder and attention deficit hyperactivity disorder have worsened. He complained of disturbed sleep. He testified that he worked briefly in 2020 at a restaurant, but he was laid off due to incidents with customers and write ups. He also endorsed chest pain and asthma when exerting himself. (Hearing testimony)

Tr. 29.

The ALJ summarized medical evidence:

At the request of the State agency, in April of 2022, [Dr.] Jose Diaz … interviewed [Castrenze] and performed a physical examination. [His] chief complaints were right arm and hand impairment, right leg impairment, attention deficit hyperactivity disorder, and depression. [He] admitted he can maintain personal care, prepare his own meals, perform housework, and drive a vehicle. Physical examination findings showed [his] blood pressure was 121/78. Visual acuity was 20/100 on the left, 20/30 on the right, and 20/25 bilaterally. He was not wearing corrective lenses. His appearance was normal. His gait/station was abnormal as he was able to stand erect with mild difficulty, but his gait was said to be normal. There were old surgical scars observed at the right elbow. His lungs were clear to auscultation bilaterally. There was right elbow, hand, and knee dysfunction noted. Deep tendon reflexes were equal with no focal deficits noted. Tinel's test was positive bilaterally. No muscle atrophy was evident. Range of motion of the right shoulder was slightly decreased with flexion to 160 degrees. Otherwise, range of motion was intact throughout. Strength was intact at 5/5 in the upper and lower extremities bilaterally. Straight leg raise testing was normal. Grip strength was intact at 5/5 bilaterally. He was alert and fully oriented. Mood and affect were normal. Speech was normal. Grooming was normal. The diagnostic impression was right arm impairment, right hand impairment, right leg impairment, attention deficit hyperactivity disorder, and depression. Dr. Diaz posited [he] can perform sitting jobs such as a desk job, driver, etc. However, x-rays of

11

the right hand were essentially normal. X-rays of the right elbow showed only "mild" osteoarthritis. X-rays of the right knee demonstrated only "mild" osteoarthritis. (Exhibit B7F)

Tr. 29.

The ALJ explained he was "moderately persuaded" by a physical assessment by a state agency medical consultant, Dr. Thomas Bixler, explaining:

> In determining [Castrenze]'s physical [RFC], I am moderately persuaded by the assessment of the State agency medical consultant, [Dr.] Bixler …. After review of the record in April of 2022, Dr. Bixler opined [he] can perform a full range of medium level exertion. (Exhibit B7A) Overall, the radiological workup showed no significant clinical abnormalities. Nonetheless, I find the evidence supports greater limits, favorable to [his] allegations, but not to the extent alleged by him. Based on opinion evidence from Drs. Diaz and Bixler, I find [his] … lies in the median. Based on this, I find [he] is capable of a wide range of light level exertion[.]

Tr. 29.

The ALJ summarized evidence specific to mental impairments:

> With regard to [Castrenze]'s mental impairments and for a historical perspective, the medical evidence from Falkenburg Raid Jail revealed that [he] has a history of detoxification for substance abuse. He was also being prescribed psychotropics for bipolar disorder. (Exhibits B4F, B5F) In connection with a prior application for disability, in November of 2014, [he] attended a psychological consultative examination. [He] alleged mood swings, depressed mood, and extreme anger. At the time of the evaluation, [he] was not taking any prescription medication. He admitted to significant legal history of seven arrests and a period of incarceration for stolen property. Mental status findings showed no signs of abnormal thought content or abnormal thought processes. [He] was also deemed cognitively capable of managing his own financial affairs. Based on the evaluation and [his] report, the diagnostic

12

impression was unspecified bipolar disorder with psychotic features and unspecified anxiety disorder. (Exhibit B2F)

Tr. 29–30.

The ALJ evaluated a report by Cecilia Yocum, Ph.D., and explained he was "generally persuaded by the clinical and objective findings" in the report "and, only in part, by the diagnostic impression":

> During the period at issue and, in May of 2022 [Dr.] Yocum … interviewed [Castrenze] and performed a consultative psychological evaluation via telehealth video conferencing. [He] reported that he has received mental health treatment and has a history of psychiatric hospitalization for three days at a behavior health center. At this time, [he] was living in a homeless shelter. Mental status findings and observations showed that [he] was casually dressed and groomed. He appeared his chronological age. He was fully oriented. He was cooperative throughout the evaluation. During the session, his mood was irritable. His affect was labile. Psychomotor behavior was agitated. He reported that he felt depressed almost every day. Appetite was poor. He endorsed suicidal thinking in the past and that he made an attempt in the past. He denied thoughts of hurting others. Speech was fairly clear, coherent, logical, and rational. He reported that he has had some hallucinations, especially when he gets very upset. Long term memory appeared intact. Immediate memory was a little low. Short term memory was limited. Concentration was good. Judgement in the hypothetical social situations was low, but abstract reasoning was fair. The diagnostic impression was specific learning disability, not otherwise specified; attention deficit hyperactivity disorder, combined presentation; bipolar disorder vs. major depressive disorder, severe; post-traumatic stress disorder; and panic disorder. (Exhibit B6F) I am generally persuaded by the clinical and objective findings contained in the report from Dr. Yocum and, only in part, by the diagnostic impression, insofar as it is consistent with the preponderance of evidence.

Tr. 30.

The ALJ stated he is "generally persuaded" by Dr. Conger's assessment:

13

In determining [Castrenze]'s mental [RFC], I am generally persuaded by the assessment of the State agency psychological consultant, Dr. Conger. After review of the record, Dr. Conger opined [he] can perform routine tasks with some social difficulties and difficulty adjusting to changes in his work duties. Dr. Conger opined [his] functional input is only partially consistent. During the recent consultative examination at Exhibit B6F, [he] alleged severe anxiety and post-traumatic stress disorder symptoms and those diagnoses were given by the Dr. Yocum. However, Dr. Conger wrote that a review of prior records does not indicate the presence of either disorder, which is inconsistent with [his] allegations of PTSD related to childhood incidents. As for [his] reports of hallucinating when he gets upset, Dr. Conger opined that this is also not consistent with a true psychotic disorder. Dr. Conger noted that [he] does have a history of social difficulties, but he shows the ability to relate effectively in general. Dr. Conger also opined that [he] displays an overall adequate mental status with no severe cognitive deficits noted. (Exhibit B7A) Of note, Dr. Conger is a licensed psychologist familiar with the evidentiary requirements of the Social Security Regulations. He provided a detailed and persuasive rational in support thereof that is consistent with the clinical and objective findings discussed above at Exhibits B2F, B4F, B5F, and B6F.

Tr. 30. The ALJ added, "Considering the record as a whole, I find it reasonable to conclude that [Castrenze] would perform best at low stress, simple work with modest social demands[.]" Tr. 30.

The ALJ added observations about Castrenze's background:

After careful review of the record, I note that [Castrenze] is a younger individual with a at least a 12th grade education and past work that is semi-skilled to skilled. (Exhibit B3E, Hearing testimony) He has admitted to a wide range of independent activities of daily living. (Exhibits B5E, B7F) During [his] recent incarceration in 2022, he underwent detoxification for alcohol and benzodiazepines. Afterwards, his symptoms of withdrawal improved. Physical examination findings and observations revealed that he ambulated independently. His gait was steady. He had full range of motion and his motor strength was intact at 5/5. (Exhibit B8F)

14

Curiously, [Castrenze] denied illicit substance use except for medical marijuana. He stated he does not take pain medication because he lost his brother and father to opiate abuse. (Hearing testimony) I note that this statement is inconsistent with recent medical records showing that drug and alcohol abuse are still an issue. (Exhibit B8F) While the record indicates [he] has a history of substance abuse disorder(s), the record also indicates that his conditions exist independently of a substance abuse disorder. Yet, [his] impairments, singly or in combination, are not totally disabling with or without the presence of a substance abuse disorder.

Overall, [Castrenze] has a sporadic work history with long periods of incarceration, which raises the question as to whether his continuing disability is directly related to a disabling impairment or for some other reason. (Exhibit B5D) Of note, a limitation to less than a full range of light level exertion and low stress, simple work with modest social demands are significant limitations. I find the [RFC] more than adequately considers [his] subjective allegations, but only those allegations that are reasonably supported by the medical evidence of record.

Tr. 30–31.

The ALJ concluded:

In sum, the [RFC] is supported by clinical and objective findings, and, only in part, by the assessments of the State agency medical and psychological consultants, opinion evidence from Drs. Bixler and Yocum, and [Castrenze]'s allegations. After careful consideration of the evidence, I find that [his] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Tr. 31.

15

At step four, the ALJ found Castrenze is unable to perform past relevant work as a server and fast-food cook. Tr. 31.

At step five, the ALJ found Castrenze can perform jobs that exist in significant numbers in the national economy, specifically identifying the jobs of bagger, final inspector, and marker. Tr. 32. The ALJ thus decided Castrenze was not disabled from September 29, 2020, to January 27, 2023. Tr. 33.

## C.   *Appeals Council's Denial of Request for Review*

Castrenze asked the Appeals Council to review the ALJ's decision, Tr. 1, and on March 6, 2023, submitted jail records from December 15, 2022, to January 31, 2023, Tr. 39–97.

On April 5, 2023, the Appeals Council denied Castrenze's request for review. Tr. 1. Regarding the jail records, the Appeals Council explained:

> You submitted medical records from Marion County Jail dated December 15, 2022, through January 24, 2023-54 pages . We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence.
>
> You submitted medical records from Marion County Jail dated January 31, 2023-5 pages. The [ALJ] decided your case through January 27, 2023. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before January 27, 2023.

Tr. 2.

16

D.    *Jail Records*

On December 15, 2022, an officer arrested Castrenze after he hit himself in the head with a beer bottle and battered an emergency medical technician. Tr. 42. When Castrenze arrived at the Marion County jail at 9:53 p.m., a nurse found him alert, oriented, and verbal. Tr. 42. He told the nurse he takes gabapentin[8] and had taken benzodiazepine.[9] Tr. 42. He refused to answer questions about his head injury. Tr. 42. He said, "Well I don't care about my head my girlfriend cheated on me." Tr. 42. He said he was upset about a felony charge. Tr. 42. He "was somewhat uncooperative with security." Tr. 42. After he "dressed out," he started talking back to security and "digging through the trash." Tr. 42. Security put him in a holding cell, where he "purposely hit his head in [the] holding cell and then went on the floor and said he had a seizure." Tr. 42.

After hitting his head in the holding cell, Castrenze visited the nurse because he had re-opened a previous cut. Tr. 43. The nurse treated a forehead laceration and small contusion. Tr. 43. The nurse placed him in restraints and on "suicide precaution" because of self-harm concerns. Tr. 43. The nurse could not measure his vitals because he was uncooperative. Tr. 43. Castrenze said

---

[8]"Gabapentin is used to help control partial seizures (convulsions) in the treatment of epilepsy." Mayo Clinic, *Gabapentin (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited on July 31, 2024).

[9]"Benzodiazepines are depressants that produce sedation and hypnosis, relieve anxiety and muscle spasms, and reduce seizures." U.S. DEA, *Benzodiazepines*, https://www.dea.gov/factsheets/benzodiazepines#:~:text=What%20are%20Benzodiazepi nes%3F,Ativan®%2C%20and%20Klonopin® (last visited on July 31, 2024).

that he has a history of seizures and takes gabapentin. Tr. 43. He smelled like alcohol, which led the nurse to ask about his drinking habits. Tr. 43. He said he drank daily and took one milligram of Xanax. Tr. 43. The nurse placed him on Clinical Institute for Withdrawal Assessment (CIWA)[10] status because of his alcohol and benzodiazepine use. Tr. 43. The nurse did not complete the intake process because he did not cooperate. Tr. 43. During a pre-segregation health assessment, the nurse opined he demonstrated strange behavior and engaged in self-harm behavior; specifically, hitting his head with a beer bottle before coming to jail and hitting his head in the holding cell. Tr. 45, 46. At the end of the evaluation, the nurse cleared him to go to suicide precaution. Tr. 45.

The next day, at 10:09 a.m., Castrenze refused, for unknown reasons, to meet with a mental health provider. Tr. 47. He did not appear distressed and remained on suicide-precaution status. Tr. 47. At 11:04 a.m., the nurse conducted a CIWA. Tr. 48. Castrenze scored a zero, meaning absent or minimal withdrawal severity. Tr. 48.

The next day, a nurse met with Castrenze in the medical pod. Tr. 49. Castrenze appeared highly agitated and anxious. Tr. 49. He said, "The demons are in my head make them stop." Tr. 49. The nurse wrote, "He responded to his name and stated the correct year" and "threatened to bag [sic] his head and split it open." Tr. 49. The nurse offered him medication, and he responded medications do not help. Tr. 52. When the assessment ended, Castrenze asked, "Are you not going to help me[?]" Tr. 52. The nurse replied that he needed

---

[10]A CIWA analyzes if a person has paroxysmal sweats, nausea/vomiting, anxiety, tactile disturbances, visual disturbance, tremor, agitation, orientation and clouding of sensorium, auditory disturbances, or headache. Tr. 48.

medication to fix the demons in his head. Tr. 52. The nurse prescribed him five milligrams of haloperidol[11] and 100 milligrams of hydroxyzine.[12] Tr. 49–50.

At 11:30 a.m., Castrenze was hitting his head against his cell wall and smearing feces in the cell. Tr. 52. When the nurse arrived, Castrenze was dripping wet with a minor forehead laceration. Tr. 52–53. Castrenze was talking about seeing demons and appeared agitated. Tr. 52. The nurse brought a psychological provider to assess him. Tr. 52. The provider conducted a psychosocial assessment because of his suicide-precaution status and unstable mental state. Tr. 50.

The assessment reported the following information. Castrenze was very distressed about incarceration. Tr. 50. Before his arrest, he was diagnosed with schizophrenia, attention-deficit disorder, attention-deficit hyperactivity disorder, and bipolar disorder. Tr. 50. In the past, he had taken trazodone[13] and Buspar[14] for psychiatric issues. Tr. 50. He has never received outpatient

---

[11]"Haloperidol is used to treat nervous, emotional, and mental conditions (eg, schizophrenia)." Mayo Clinic, *Haloperidol (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/haloperidol-oral-route/description/drg-20064173#:~:text=Haloperidol%20is%20used%20to%20treat,adult%20patients%20who%20have%20dementia (last visited on July 31, 2024).

[12]"Hydroxyzine is used to help control anxiety and tension caused by nervous and emotional conditions." Mayo Clinic, *Hydroxyzine (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/description/drg-20311434 (last visited on July 31, 2024).

[13]"Trazodone is used to treat depression. It is thought to work by increasing the activity of serotonin in the brain. Trazodone is an antidepressant." Mayo Clinic, *Trazodone (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/description/drg-20061280 (last visited on July 31, 2024).

[14]Buspar is "used to treat certain anxiety disorders or to relieve the symptoms of anxiety." Mayo Clinic, *Buspirone (Oral Route)*, https://www.mayoclinic.org/drugs-

or inpatient treatment. Tr. 50. He has never been in a psychological facility under the Baker Act.[15] Tr. 50. He has a history of asthma but has had no significant injuries, head injuries, or history of non-psychiatric medications. Tr. 50. He has a high school diploma but did not attend college. Tr. 50. Before his arrest, he was on disability status. Tr. 50. He has had few jobs. Tr. 50. He is single and has two boys. Tr. 50. His parents are deceased. Tr. 51. "[H]e had three siblings, but they are all dead and he is next." Tr. 51. He has no family history of suicide, substance abuse, or incarceration. Tr. 51. He has always had few friends. Tr. 51. He feels comfortable interacting socially but does not have a supportive social network. Tr. 51. He often has flashbacks or vivid recollections of trauma. Tr. 51. He has never been sexually, physically, or emotionally abused. Tr. 51. He was not significantly neglected as a child, was never raped, and never witnessed family physical violence. Tr. 51.

Asked about his family history of psychological issues, Castrenze answered, "[E]veryone is dead due to mental health issues." Tr. 51. Asked about his substance use and abuse history, he answered he drinks alcohol, uses Xanax, and uses "enough LSD to be clinically insane." Tr. 51. He said he used

---

supplements/buspirone-oral-route/description/drg-20062457 (last visited on July 31, 2024).

[15]The Baker Act "focuses on crisis services for individuals with mental illness[.]" FLDCF, *Baker Act*, https://www.myflfamilies.com/crisis-services/baker-act (last visited on July 31, 2024). "An individual may be taken to a receiving facility for involuntary examination under the Baker Act if: [t]here is reason to believe he/she has a mental illness and due to the mental illness, the individual has refused or is unable to determine if examination is necessary; … [w]ithout care or treatment, the individual is unlikely to care for themselves which can result in substantial harm to their well-being, and it is not evident that harm can be avoided through familial intervention or other services; or [i]t is likely, based on recent behavior, that without treatment, the individual will pose a serious threat to themselves or others." *Id.*

substances before his incarceration, but he would not discuss the substances. Tr. 51. He denied having had any treatment for substance abuse. Tr. 51. He denied any history of sexual offenses, violence, or aggression. Tr. 51. Asked if he had experienced a seriously traumatic event, he answered, "[I] was in prison for 7 years and watched people die." Tr. 51. He said someone almost choked him to death, and he watched his father die. Tr. 51.

Castrenze said he has had prior suicidal ideations. Tr. 51. The provider opined that hitting himself with a beer bottle and banging his head in the holding cell constituted suicidal ideations. Tr. 51. Castrenze said he has a history of suicide attempts but no hospitalizations for suicide. Tr. 51. Asked if he had ever threatened to commit suicide without any real intent to kill himself, he answered no. Tr. 51. Asked if he ever hurt himself without intending to die, he answered that he has engaged in self-harm by hitting his head five or fewer times. Tr. 51–52.

The provider wrote that Castrenze appeared disheveled and malodorous with a hostile attitude. Tr. 52. The provider wrote that, during the exam, Castrenze had a confused orientation, disorganized thought process, delusions, and hallucinations. Tr. 52. The provider wrote that Castrenze has a medium risk for suicide, violence, self-injury, and victimization. Tr. 52. The provider recommended that Castrenze remain on suicide-precaution status and ordered neuro check observations for twenty-three hours. Tr. 52–53. After the evaluation, the provider prescribed Castrenze 100 milligrams of Vistaril[16] and

---

[16]Vistaril is the brand name for hydroxyzine. Mayo Clinic, *Hydroxyzine (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/description/drg-20311434 (last visited on July 31, 2024).

five milligrams of Haldol.[17] Tr. 53. The provider also prescribed Castrenze one milligram of benztropine.[18] Tr. 96.

Later that day, the nurse conducted a CIWA and concluded that Castrenze scored a six. Tr. 55. Castrenze received three points for anxiety and three points for agitation. Tr. 55. Castrenze's withdrawal severity was absent or minimal. Tr. 55. Later, the nurse evaluated Castrenze and wrote that he was fully conscious with clear speech. Tr. 57. Later, the nurse checked on Castrenze, but he refused the prescribed neuro check and nursing assessment. Tr. 58. Later, the nurse conducted a CIWA, and Castrenze scored a zero. Tr. 59. Later, Castrenze refused the prescribed neuro check and nursing assessment. Tr. 60.

The next day, twice in the early morning, Castrenze refused a nursing assessment and neuro check. Tr. 61–62. Later, he moved to the medical pod. Tr. 63. Later, he refused to meet with the provider. Tr. 64. The provider opined that Castrenze did not appear distressed but that she would keep him on suicide-precaution status. Tr. 64. Three times that evening, the nurse conducted a CIWA, and Castrenze scored zeroes each time. Tr. 65–67.

---

[17]Haldol is the brand name for haloperidol. Mayo Clinic, *Haloperidol (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/haloperidol-oral-route/description/drg-20064173 (last visited on July 31, 2024).

[18]Benztropine is "used to control severe reactions to certain medicines that are used to treat nervous, mental, and emotional conditions." Mayo Clinic, *Benztropine (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/benztropine-oral-route/description/drg-20072652 (last visited on July 31, 2024).

The next day, the nurse conducted a CIWA, and Castrenze again scored a zero. Tr. 69. A few minutes later, the provider met with him to follow up on his suicide-precaution status. Tr. 70. Castrenze appeared disheveled, with poor hygiene and wounds on his face. Tr. 70. His behavior was within normal limits, and he had a cooperative attitude. Tr. 70. His mood, affect, thought process, and thought content were within normal limits. Tr. 70. He denied having any thoughts of suicide, homicide, or self-injurious behavior. Tr. 70. He denied having any perceptual disturbances, and his consciousness was within normal limits. Tr. 70. The provider wrote that Castrenze's memory appeared normal, and he was alert and oriented. Tr. 70. Castrenze said he had hope for the future. Tr. 71. The provider opined that she had witnessed improvement within the last twenty-four hours. Tr. 70–71. Throughout the examination, Castrenze apologized for how he acted upon arriving at the jail. Tr. 71. At the end of the evaluation, the provider recommended removing his suicide-precaution status and having him complete the intake process. Tr. 71.

The next day, the nurse conducted a CIWA, and Castrenze scored a six. Tr. 72. Castrenze mentioned nausea, anxiety, and headache during the assessment, but his withdrawal severity remained absent or minimal. Tr. 72. Later that day, the provider cleared him to move from suicide-precaution status to the general population. Tr. 73. The next day, at three different times, the nurse conducted a CIWA, and Castrenze scored a zero. Tr. 74–76. The next day, the nurse conducted a CIWA, and Castrenze scored a two because he had a headache. Tr. 77. His withdrawal severity remained absent or minimal. Tr. 77. The nurse prescribed 325 milligrams of Tylenol. Tr. 97. Later that day, the nurse conducted a CIWA, and Castrenze scored a zero. Tr. 78. A few days later,

the nurse conducted six CIWAs, and Castrenze scored a zero on each. Tr. 79–84. During each assessment, his withdrawal severity remained absent or minimal. Tr. 79–84.

Thirteen days after the arrest, Castrenze requested a nebulizer because of his asthma history. Tr. 85. The nurse reviewed his oxygen readings from his previous visits, which were ninety-eight to ninety-nine percent. Tr. 85.

Fifteen days after the arrest, the nurse conducted a detailed health evaluation and assessment. Tr. 86. The nurse asked Castrenze questions about his physical and mental health. Tr. 86–89. He said he had vision, dental, and hearing problems. Tr. 86. He said he experiences pain in his right leg, left elbow, and back. Tr. 86–87. He reported having blunt-force trauma to the head and severe headaches. Tr. 86. He said he suffers from attention-deficit hyperactivity disorder, anxiety, depression, hallucinations, schizophrenia, attention deficit disorder, and a history of suicide attempts. Tr. 87. He said he is an excessive drinker. Tr. 87. He said he uses LSD, marijuana, methamphetamine, benzodiazepine, and Adderall, and smokes one pack of cigarettes per day. Tr. 87. During the evaluation, the nurse wrote he has no neuro deficiencies and a normal mental status. Tr. 88.

On January 24, 2023—more than a month after the arrest and a few days before the period under consideration ended—Castrenze visited the nurse for a toothache. Tr. 91. The nurse placed him on the dentist's list and prescribed 400 milligrams of ibuprofen for five days. Tr. 91. Two hours later, the dental nurse reviewed his evaluation and prescribed 500 milligrams of naproxen for forty-five days. Tr. 92.

24

On January 31, 2023—four days after the period under consideration—Castrenze asked to see a provider about anxiety. Tr. 93. He complained about pain in his right arm and leg from prior injuries. Tr. 93. The nurse wrote that he appeared oriented, with clear speech and appropriate responses. Tr. 93. The nurse continued the naproxen prescription and referred him to a provider for anxiety. Tr. 94.

### E.   *Report of Court-Ordered Competency and Psychiatric Evaluation*

On July 24, 2023—after the ALJ's decision, Tr. 33, after the Appeals Council had denied Castrenze's request for review, Tr. 1, and after he had filed this lawsuit, Doc. 1—he was charged with battery on a law enforcement officer, resisting arrest with violence, loitering or prowling, and leaving the scene of a crash with property damage, Doc. 25 at 1; Doc. 25-1 at 1. A state judge ordered a competency and psychiatric evaluation. Doc. 25-1 at 1.

The following year, on March 2, 2024, Richard Cipriano, Psy.D., evaluated Castrenze at the Falkenburg Road jail. *Id.* In a March 4, 2024, report, Dr. Cipriano detailed Castrenze's background information and mental status. *Id.* at 2. Dr. Cipriano's diagnostic impressions of Castrenze were unspecified mood disorder, malingering, cannabis use disorder, and stimulant use disorder. *Id.* at 3. Dr. Cipriano opined that Castrenze's appreciation of the charges, ability to disclose to his attorney facts relevant to the proceeding, and ability to manifest appropriate courtroom behavior were "acceptable at this time." *Id.* Dr. Cipriano opined that Castrenze's appreciation of possible penalties, ability to understand the nature of the proceedings, and ability to testify relevantly were "unacceptable at this time." *Id.* Dr. Cipriano opined that

Castrenze "should be considered incompetent to proceed." *Id.* Considering the charges and symptomatology, Dr. Cipriano recommended Castrenze's transfer to the Florida State Hospital for treatment and competency restoration training. *Id.* at 4. Dr. Cipriano opined, "Competency restoration outcomes should be expected in 3–6 months." *Id.*

## IV.   Standard of Review

### A.   *General*

A court reviews "de novo the legal principles upon which the Commissioner's decision is based." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (italics omitted). A court reviews for "substantial evidence" the Commissioner's factual findings. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoted authority omitted).

### B.   *Jail Records*

When the Appeals Council "erroneously refuses to consider evidence, it commits legal error and remand is appropriate." *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321 (11th Cir. 2015). Therefore, "whether evidence meets the new, material, and chronologically relevant standard" is subject to de novo review. *Washington*, 806 F.3d at 1321; *see also Pupo v. Comm'r, Soc. Sec. Admin.*, 17 F.4th 1054, 1060 (11th Cir. 2021) (applying de novo review when the Appeals Council stated "'[w]e did not consider or exhibit this evidence'"). Different circumstances occur when "the Appeals council

26

consider[s] the additional evidence and then denies review." *Washington*, 806 F.3d at 1321 n.5.[19]

Here, the Appeals Council identified the jail records from December 15, 2022, to January 24, 2023, found no reasonable probability that they would change the outcome of the ALJ's decision, and declined to "exhibit" those jail records. Tr. 2. The Appeals Council also identified the jail record from January 31, 2023, and found the evidence does not relate to the period under consideration (i.e., September 29, 2020 (the application date) through January 27, 2023 (the decision date)). Tr. 2. Neither side specifically addresses whether, under these circumstances, the de novo standard or substantial evidence standard applies. Castrenze's brief discusses the substantial evidence standard in the standard of review section but appears to apply the de novo standard in the argument section. *See* Doc. 23. The Commissioner's brief discusses the substantial evidence standard in the standard of review section and applies the substantial evidence standard in the argument section. *See* Doc. 24. Affirmance is warranted applying either standard of review.

---

[19]In two unpublished decisions, the Eleventh Circuit has stated that the deferential standard applies where the Appeals Council denies review but in doing so considers—as opposed to refuses to consider—additional evidence. *See Goble v. Soc. Sec. Admin., Comm'r*, No. 22-10842, 2023 WL 2823401, at *8 n.20 (11th Cir. Apr. 7, 2023) ("A more deferential standard is applied when the Appeals Council considers a claimant's additional evidence[.]"); *Sanders v. Soc. Sec. Admin., Comm'r*, 854 F. App'x 311, 315–16 (11th Cir. 2021) (holding that when the Appeals Council considered additional evidence and found no reasonable probability the evidence would change the outcome, remand was inappropriate because "substantial evidence supports the Appeals Council's determination that no 'reasonable probability' existed that the additional evidence would change the outcome").

C.     *Report of Court-Ordered Competency and Psychiatric Evaluation*

"The judicial determination of whether new evidence renders appropriate a [sentence six] remand ... is a *de novo* proceeding." *Hyde v. Bowen*, 823 F.2d 456, 458–59 (11th Cir. 1987). The Court thus reviews Castrenze's motion de novo.

V.     **Analysis**

A.     *Jail Records*

Castrenze argues the jail records from December 15, 2022, through January 14, 2023, pertain to the period before the ALJ issued the January 27, 2023, decision "and therefore were materially relevant." Doc. 23 at 3.[20] He observes the ALJ found he suffers from bipolar depression, post-traumatic stress disorder, learning disabilities, and substance abuse disorder but had only moderate limitations in interacting and relating with others and mild limitations in concentration, persistence, and pace. *Id.* at 4 (citing Tr. 26–27). He observes medical records from before the ALJ's January 27, 2023, decision are "somewhat scant," mostly due to his homelessness. *Id.* He argues the jail records are "fairly strong evidence that [his] mental illness was more severe at the time of the [ALJ] decision and probably would have changed the findings in the [ALJ] decision." *Id.* at 5. He argues the jail records generated after the

---

[20]Castrenze's brief states that the Appeals Council evaluated the records through January 14, 2023. Doc. 23 at 3. The Commissioner's brief states Castrenze relies on evidence through January 14, 2023. Doc. 24 at 10. The records themselves and the Appeals Council decision show that the records continue through January 24, 2023. Tr. 3, 92–93.

ALJ's January 27, 2023, decision "are simply a continuation of the treatment notes," he experienced "no sudden change in … his condition" a few days after the ALJ's January 27, 2023, decision, and the jail records after that day are "clearly and unmistakably" relevant to the period under consideration. *Id.*

The Commissioner argues that Castrenze has offered nothing more than his own beliefs "to refute the Appeals Council's finding that the [jail records] did not show a reasonable probability of changing the outcome of the decision." Doc. 24 at 2. The Commissioner argues Castrenze "essentially" asks this Court to re-weigh the evidence, contending that to give Castrenze relief, the Court would have to credit his view of the jail records "despite contrary evidence in the record." *Id.* at 3. The Commissioner argues the jail records are similar to the prior jail records the ALJ considered. *Id.* at 8.

Contrary to Castrenze's argument, there is no "reasonable *probability*" that the jail records—which show symptoms, detoxification treatment, and mental-health improvement after the initial period of confinement—"would change the outcome of the decision." *See* 20 C.F.R. § 416.1470(a)(5) (quoted; emphasis added). The jail records explain that the nurse placed Castrenze on suicide-precaution status. *See* Tr. 45. The ALJ considered evidence that Castrenze has experienced suicidal thoughts and has attempted suicide. *See* Tr. 30, 639. The jail records show Castrenze struggled with alcohol and drug abuse. *See* Tr. 43, 51. The ALJ considered evidence that Castrenze has struggled with alcohol and drug abuse. *See* Tr. 30–31, 163. The jail records address Castrenze's schizophrenia, attention-deficit disorder, attention-deficit hyperactivity disorder, bipolar disorder, and anxiety. *See* Tr. 50, 87. The ALJ considered evidence of those mental impairments. *See* Tr. 26, 30, 164, 401.

Considering the jail records and the ALJ's decision addressing the same subject matter, the "reasonable probability" standard is not met. *See Sanders v. Soc. Sec. Admin., Comm'r*, 854 F. App'x 311, 315–16 (11th Cir. 2021) ("The Appeals Council committed no error in declining to consider Sanders's additional evidence. The medical records pre-dating the ALJ's decision contained no new material information. Instead, [they] contained the same clinical findings evidenced in records already submitted to the ALJ … Because these records were cumulative of evidence already considered by the ALJ, substantial evidence supports the Appeals Council's determination that no 'reasonable probability' existed that the additional evidence would change the outcome. In a similar way, the medical records post-dating the ALJ's decision also consisted of duplicative findings and diagnoses: no new or material evidence.").

Whether the Appeals Council was correct that the jail record from January 31, 2023, does not relate to the period through January 27, 2023, matters naught, as any error is harmless. The record shows only that Castrenze visited the nurse that day for anxiety and pain in his right arm and leg from prior injuries, for which the nurse assessed pain in his right arm and leg from prior injuries, continued him on Naproxen, and referred him for an anxiety evaluation. Tr. 93–94. The ALJ considered the same subject matter. *See* Tr. 29–30.

Remanding this case for consideration of the jail records is unwarranted.

**B.     *Report of Court-Ordered Competency and Psychiatric Evaluation***

Castrenze argues the Court should remand this case for further proceedings under sentence six of § 405(g) because the March 4, 2024, report of the March 2, 2024, court-ordered competency and psychiatric evaluation "reflects the severity of the claimant's mental condition" when the ALJ issued the January 27, 2023, decision. Doc. 25 at 2.

The Commissioner concedes the report is new but argues that remand is unwarranted because the report is not material and there is no reasonable probability that the report would change the ALJ's decision, including because the information in the report does not relate to the period at issue. Doc. 27 at 1–6.

At a minimum, as the Commissioner argues, the information in the report does not relate to the period the ALJ considered, ending on January 27, 2023. *See* Tr. 33. The information, including Dr. Cipriano's opinion on competency to proceed in a criminal case, relates to Castrenze's condition "at this time," which was March 2, 2024, more than a year after the period the ALJ considered. Doc. 25-1 at 1, 3. Much can happen in a year, including new criminal charges affecting mental health. *See Enix v. Comm'r of Soc. Sec.*, 461 F. App'x 861, 863–64 (11th Cir. 2012) ("Enix's new evidence addressed her condition after the ALJ's November 19, 2008 decision. Contrary to Enix's contention, these treatment notes do not provide any new insight into whether her seizures were under control during the time period reviewed by the ALJ. At most, these documents showed that Enix's condition was subsequently deteriorating, which is not sufficient to warrant a sentence six remand.").

Remanding this case to consider the report is unwarranted.

## VI.    Conclusion

The undersigned recommends **affirming** the Commissioner's decision, **denying** Castrenze's motion, Doc. 25, and **directing** the clerk to enter judgment against Daniel Castrenze and for the Commissioner of Social Security and close the file.

## VII.    Deadlines to Object and Respond to Objections

"Within 14 days after being served with a copy of [a report and recommendation], a party may serve and file specific written objections[.]" Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections alters the scope of review by the district judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on August 1, 2024.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:    The Honorable Virginia Hernandez Covington
      Counsel of record

32